# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE DIVISION

| | | |
|---|---|---|
| **EATON J. HEBERT, JR.** | * | **CIVIL ACTION NO. 11-0299** |
| **VERSUS** | * | **JUDGE MELANÇON** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Eaton J. Hebert, Jr., born April 27, 1967, filed applications for a period of disability, disability insurance benefits, and supplemental security income on March 10, 2009, alleging disability as of August 15, 2006, due to back problems, high blood pressure, high cholesterol, and anxiety.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability and that the Commissioner's decision comports with all relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of Fed. R. Civ. P. 52, I find that the Commissioner's findings and conclusions are supported by substantial evidence, which can be outlined as follows:

**(1) Records from Dr. Patrick Juneau dated June 15, 2006 to September 5, 2006**. Claimant presented with neck and interscapular pain, as well as bilateral arm pain and numbness, after being injured twice at work. (Tr. 170). On examination, he had tenderness and spasm in the cervical, trapezius, and interscapular regions, and positive Tinel's signs bilaterally over the right cubital and right carpal tunnel areas. (Tr. 171). Straight leg raising was negative.

Neurologically, claimant was normal. He had 4/5 strength in the upper extremities and 5/5 in the lower extremities. (Tr. 172). He had some diminished pinprick and light touch sensation over both arms, forearms, and fingers. (Tr. 173). He had intact sensation in the lower extremities. Deep tendon reflexes were hypoactive at 1+.

X-rays showed no fracture or subluxation in the spine. (Tr. 174, 176). A bone scan was normal. (Tr. 179). EMGs and nerve conduction studies showed bilateral carpal tunnel syndromes, entrapment of the left cubital tunnel, and mild ulnar slowing across the wrists. (Tr. 182). Lumbar MRI was normal with no spinal stenosis. (Tr. 177, 191-92).

Thoracic MRI showed a small right paracentral disc protrusion at T7-T8, which was an asymptomatic finding consistent with some degenerative changes in claimant's spine. (Tr. 174, 177, 191, 194). His cervical spine MRI revealed central disc protrusions at C4-5 and C5-6, with no significant extrinsic pressure on the cord. (Tr. 178, 193).

Dr. Juneau prescribed outpatient therapy for claimant's neck and arms, and splints for his wrists and elbows. (Tr. 175).

**(2) Records from American Legion Hospital dated February 3, 2006 to June 14, 2008**. On February 3, 2006, claimant complained of pain to his low back resulting from an injury at work. (Tr. 197). He also reported that the pain was shooting down both arms, but worse on the right. (Tr. 198). He was prescribed Toradol and Flexeril. (Tr. 197).

On January 21, 2007, claimant was admitted for complaints of addiction to Lortab, Xanax, and Soma due to a back injury in February, 2006. (Tr. 207). He wanted help to get off of the medications.

On June 13, 2008, claimant was admitted for an apparent grand mal seizure while at the dinner table. (Tr. 214). CT of the brain showed no definite abnormalities. Drug screen was positive for opioids, benzodiazepines, and cocaine. (Tr. 216). The diagnoses were new onset seizures, possibly related to

benzodiazepine withdrawal, cocaine abuse, dyslipidemia, hypertension, and lumbar, thoracic and cervical disc disease.

**(3) Records from Dr. D. Thomas Curtis dated June 8, 2005 to November 5, 2008**.  On February 3, 2006, claimant complained of lower back pain after lifting a sack of concrete at work.  (Tr. 225).  He had pain in the right SI area into the buttock and spasm.  The assessment was strain.

On April 13, 2006, claimant complained that both arms were painful with numbness and swelling with pain in both elbows.   Dr. Curtis noted that his exam was not consistent with these complaints. (Tr. 224).

On August 22, 2006, claimant complained that lifting his arms overhead was "a problem" and his neck and back "are killing me."  (Tr. 222).  Dr. Curtis noted that claimant made poor effort on examination.

On November 5, 2008, claimant reported that he was feeling fine with no new problems.  (Tr. 218).

**(4) Records from Drs. Daniel Baker and Baylen G. Kimball dated October 24, 2006 to March 23, 2009**.  Claimant was treated for chronic pain syndrome in his shoulders and arms.  (Tr. 227-332).  He was prescribed Lortab, Soma, OxyContin, and Xanax.  (Tr. 242-332).  He had no complications from his medications.

4

After his medication regimen, claimant's pain level dropped from 8-10 to 3 on a scale of 1 to 10. (Tr. 297, 300). On March 5, 2009, he reported that 80-90% of his pain had been relieved. (Tr. 244).

**(5) Records from Opelousas General Hospital dated May 13, 2009**. X-rays of the lumbar and thoracic spine showed moderate degenerative changes. (Tr. 333-34). Cervical spine views revealed no acute osseous abnormalities. (Tr. 335).

**(6) Consultative Examination by Dr. Kelly Babineaux dated May 16, 2009**. Claimant complained of neck and back problems, high blood pressure, cholesterol, seizures, and anxiety. (Tr. 336). He had smoked one pack of cigarettes per day since age 17. He also reported headaches three times a week lasting 10 to 15 minutes. His symptoms were relieved by prescription medications.

Claimant could dress and feed himself, stand at one time for 10 minutes, stand for four out of eight hours, walk on level ground one block, sit for 20 minutes, lift five pounds, drive for 10 minutes, cook, and do dishes. His medications included Lortab 10 mg every four to six hours, Alprazolam every eight to 12 hours, Simvastatin, OxyContin 80 mg. as needed, Carisoprodol, Lisinopril/HCTZ, and Nitrolingual pump. (Tr. 337).

On examination, claimant was 69 ½ inches tall, weighed 194 pounds, and had blood pressure of 121/76.  He had slight difficulty getting on and off the exam table and up and out of the chair.  He could dress and undress himself normally.

Claimant had normal gait, but complained of back pain.  (Tr. 338).  He had had a cane for six months, but it did not appear to be medically required for ambulation.  Grip strength bilaterally was 5/5.

Neurologically, claimant had 5/5 motor, good proximal muscle group strength, no atrophy, and intact sensory.  (Tr. 339).  His deep tendon reflexes were slightly decreased for the right knee compared to the left.

Dr. Babineaux's impression was that claimant's blood pressure was well-controlled with no end-organ damage.  For his seizures, claimant did not report a seizure history, but did report one syncopal episode in 2008.  He was on anxiety medication and was not anxious on exam.

Claimant had limited range of motion in his neck and back, particularly in his back.  He reported back pain with straight leg raise as well as with walking on tiptoes and heels.  While he had limited range of motion in his back, his gait was normal.  His mental exam was normal.

**(7) Physical Residual Functional Capacity ("RFC") Assessment dated June 2, 2009**.  Dr. Charles Lee determined that claimant could lift 20 pounds

occasionally and 10 pounds frequently.  (Tr. 342).  He could stand/walk and sit about six hours in an eight-hour workday.  He had unlimited push/pull ability.

Claimant could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; frequently balance, and never climb ladders, ropes, or scaffolds.  (Tr. 343).  He had to avoid all exposure to hazards, such as machinery and heights, due to seizure disorder.  (Tr. 345).

**(8) Psychiatric Review Technique dated June 2, 2009**.  Joseph Tramontana, Ph.D., assessed claimant for anxiety-related disorders.  (Tr. 350).  He found that claimant's impairment was not severe.  Claimant had no functional limitations.  (Tr. 360).

**(9) Records from Dr. Thomas Curtis dated November 5, 2008 to November 13, 2009**.  On May 5, 2009, claimant felt okay with no new problems.  (Tr. 368).  On September 22, 2009, he reported having a seizure, but was fine at that time.  (Tr. 367).

**(10) Records from Dr. Lester Ducote dated October 30, 2002 to December 10, 2009**.  On November 22, 2002, claimant was admitted for complaints of angina.  (Tr. 372).  Coronary angiography revealed about a 50% lesion in the obtuse marginal artery.  He had a dominant right with only minor

plaques and an LAD with some mild diffuse plaquing.  He also had an ejection fraction of 81%.

Dr. Ducote recommended medical therapy with discontinuation of cigarette smoking and a proper diet to get claimant's lipid levels to an acceptable level.  The assessment was angina and arteriosclerotic heart disease.

On May 13, 2009, claimant complained of chest pain.  (Tr. 447).  Dr. Ducote noted that claimant had continued to smoke one pack of cigarettes daily, and was not diet-compliant.  (Tr. 452).  On examination, his blood pressure was 102/62, and he weighed 194 pounds.

Claimant was admitted for left heart catheterization on June 16, 2009.  (Tr. 442).  He had significant areas of stenosis in the right coronary artery and left anterior descending arteries.  (Tr. 454).  Two stents were placed in claimant's right coronary artery.  Dr. Ducote prescribed Plavix and advised claimant to discontinue cigarette smoking to decrease his risk for further problems.

Dr. Ducote's notes dated July 6, 2009, indicated that claimant was still smoking.  (Tr. 463).  His angina was stable and he had no new complaints.  (Tr. 463, 465).

On October 15, 2009, claimant's angina was stable.  (Tr. 468).  Claimant had no new complaints.  He was prescribed Plavix on December 10, 2009.  (Tr.

473).

**(11) Claimant's Administrative Hearing Testimony**. At the hearing on January 27, 2010, claimant was 43 years old. (Tr. 29). He testified that he was 5 feet 9 ½ inches tall and weighed between 170 and 175 pounds. He lived with his wife and two children, ages five and seven. (Tr. 30).

Claimant stated that he had completed the fourth or fifth grade. (Tr. 31). He had gone to trade school for carpentry. He reported that he could not read or write at all, but could do arithmetic to get the correct change when he went to the store.

Claimant had past work experience in construction as a laborer. (Tr. 32). He had also worked as a groundskeeper and a foreman. He stated that he had to read blueprints when he worked as a foreman for BellSouth. (Tr. 33).

Regarding complaints, claimant testified that he had seven "blown out" discs in his back. (Tr. 33). He also complained of heart problems, which caused him to have chest pain when he did too much. (Tr. 33, 35). He stated that he was seeing a pain management doctor monthly for back pain. (Tr. 34).

Claimant reported that he was taking Oxycontin and Lortab for pain. He said that the medications helped a lot. (Tr. 38). He did not report any side effects. He testified that he smoked a pack of cigarettes a day. (Tr. 35).

As to restrictions, claimant reported that he could only walk a half a block at the most, then had to stop and rest. (Tr. 34). He testified that lifting a 10 pound bag of potatoes hurt him. He stated that he could reach overhead. (Tr. 35).

Regarding activities, claimant stated that he drove his truck every couple of days. (Tr. 30, 36). He testified that he spend most of his days sitting and walking around the house. (Tr. 36). He reported that he watched his children when they were not in school. He also watched TV and visited with friends who came over to visit. (Tr. 37). Additionally, he mowed the grass. (Tr. 42).

Claimant reported that he had settled his worker's compensation claim for $25,000. (Tr. 30). He stated that he wanted to have surgery, but worker's comp had refused to pay for it. (Tr. 39).

**(12) Administrative Hearing Testimony of Thomas M. Lafosse, Vocational Expert ("VE")**. Mr. Lafosse described claimant's past work as a construction worker as heavy and semi-skilled, a laborer as very heavy and SVP-1 unskilled, and a groundskeeper as medium and SVP-3. (Tr. 44). The ALJ posed a hypothetical in which he asked the VE to assume a claimant of the same age, education, and work experience, who could lift and carry 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for six hours, and could not do any overhead work or work where he would be subject to hazards such as dangerous

moving machinery or unprotected heights. In response, Mr. Lafosee testified that he could do a wide range of light work, including production worker, of which there were 222,000 positions nationally; freight and stock handler, of which there were 47,000 positions, and hand packer or packager, of which there were 318,000 positions.

The ALJ modified the hypothetical to limit claimant to sedentary work where he could lift and carry only 10 pounds, stand and walk for about two hours, sit for six hours, and had the same non-exertional limitations. (Tr. 44-45). In response, the VE testified that he could work as a production worker, freight handler, and hand packer. (Tr. 45). When the ALJ asked whether any jobs would be available if claimant had pain and limitations which would interfere with his ability to sustain work for eight hours three or four days a month, Mr. Lafosse testified that with that sort of absenteeism, that person would have a difficult time maintaining employment.

Claimant's attorney then asked whether the jobs that Mr. Lafosse had identified would be impacted if claimant was illiterate. In response, the VE answered that they would not.

**(13) The ALJ's findings are entitled to deference**. Claimant argues that: (1) the ALJ erred in finding that he could sustain light work, as there was not

substantial evidence to support the ALJ's conclusion when evidence existed as to claimant's exertional and non-exertional limitations, and (2) the ALJ erred in disregarding the VE's testimony that assuming claimant's limitations, there would be no jobs available for him on a consistent basis.

As to the first argument, claimant argues that the ALJ placed no weight on the medical evidence, instead choosing to rely on the opinions of the non-examining physicians from the Disability Determination Services. However, the record reflects that the ALJ relied on all of the evidence, including the diagnostic records and the reports from claimant's treating physicians, in finding that he had the ability to do light work.

Specifically, the ALJ referred to claimant's MRI findings, as well as the reports of his treating neurosurgeon, his pain management specialists, and his treating cardiologist. (Tr. 14-15). Dr. Juneau found that claimant's lumbar MRI was normal, and his thoracic MRI showed a "small" right paracentral disc protrusion at T7-T8, which was "an asymptomatic finding." (Tr. 174). Claimant's cervical MRIs revealed a "small" annular tear at C2-3, a right paracentral disc herniation at C3-4, "tiny" central disc protrusions at C5-6 with no significant extrinsic pressure on the cord, and "small" local right paracentral disc herniation at C6-7. (Tr. 178, 193).

To prove disability resulting from pain, an individual must establish a medically determinable impairment that is capable of producing pain. *Ripley v. Chater*, 67 F.3d 552, 556 (5th Cir. 1995). Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity. *Id*. Disabling pain must be constant, unremitting, wholly unresponsive to therapeutic treatment, and corroborated in part by objective medical testimony. *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991).

In this case, the records reflect that claimant's pain not unremitting and wholly unresponsive to therapeutic treatment, as claimant himself testified that his medications had helped him "a lot." (Tr. 38). As the ALJ noted, claimant apparently did well on medication and had no adverse side effects. (Tr. 15). This is supported by the records from his pain management physicians. (Tr. 227-332). After his medication regimen, claimant's pain level dropped from 8-10 to 3. (Tr. 244, 300). He reported that 80-90% of his pain had been relieved. (Tr. 244, 297). If an impairment reasonably can be remedied or controlled by medication, treatment or therapy, it cannot serve as a basis for a finding of disability. *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988); *Lovelace v. Bowen*, 813 F.2d 55, 59

(5th Cir. 1987).

Although claimant testified that he wanted surgery, there was no medical evidence to support that assertion. Instead, the records reflect that his doctors recommended conservative treatment, including physical therapy and medications. As stated above, claimant's pain was relieved by medication, which belies his claim of disability.

Claimant also argues that the ALJ chose the opinion of the non-examining DDS doctor over his examining physicians. However, the ALJ's decision reflects that he considered the reports from the treating physicians and the consultative examiner, Dr. Babineaux. (Tr. 15). The ALJ rejected Dr. Baker's opinion that claimant could not work because of pain as it was not consistent with the record. (Tr. 16).

Whether pain is disabling is an issue for the ALJ, who has the primary responsibility for resolving conflicts in the evidence. *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Carrier v. Sullivan,* 944 F.2d 243, 247 (5th Cir.1991). It is within the ALJ's discretion to determine the disabling nature of a claimant's pain, and the ALJ's determination is entitled to considerable deference. *See Wren v. Sullivan,* 925 F.2d 123, 128 (5th Cir.1991); *James v. Bowen,* 793 F.2d 702, 706 (5th Cir.1986). As the ALJ's determination as to pain is supported by the

evidence, it is entitled to deference. *Id*.

Next, claimant argues that he suffers from heart disease, as well as orthopedic problems. However, as the ALJ noted, claimant had no new complaints after his stent placements. (Tr. 15). This is supported by the records from Dr. Ducote, who noted that claimant had stable angina and no new complaints post-procedure. (Tr. 463, 465, 468).

Additionally, the record reflects that claimant was non-compliant with his treatment regimen. Dr. Ducote repeatedly advised claimant to discontinue cigarette smoking and follow a proper diet. (Tr. 372). Despite this admonition, claimant continued to smoke one pack of cigarettes daily and was not diet-compliant. (Tr. 452, 463). It is well established that failure to follow prescribed medical treatment precludes an award of benefits. 20 C.F.R. § 416.930(a), (b); *Johnson v. Sullivan*, 894 F.2d 683, 685, n. 4 (5th Cir. 1990). Thus, this argument lacks merit.

Finally, claimant argues that the ALJ erred in failing to accept the vocational expert's testimony that claimant would have a difficult time maintaining employment if he had pain and limitations which would interfere with his ability to sustain work for eight hours three or four days a month. (Tr. 45). However, it is well established that the ALJ is not bound by VE testimony which

is based on evidentiary assumptions ultimately rejected by the ALJ. *See Owens v. Heckler,* 770 F.2d 1276, 1282 (5th Cir.1985); *Falls v. Apfel*, 2000 WL 329233, *7 (E.D. La.2000).

Here, the ALJ rejected claimant's testimony based on the evidence of record. The ALJ's findings as to claimant's limitations are supported by the report from Dr. Lee. (Tr. 342-45). As the ALJ's hypotheticals to the vocational expert reasonably incorporated all disabilities of the claimant recognized by the ALJ, and the claimant or his representative had the opportunity to correct deficiencies in the ALJ's question, the ALJ's findings are entitled to deference. *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001); *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

Based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.** *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, **79 F.3D 1415 (5TH CIR. 1996).**

Signed April 2, 2012, at Lafayette, Louisiana.

*/s/ C. Michael Hill*
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE